## BRUNSWICK–BALKE–COLLENDER CO. v. WISCONSIN MAT CO.

Circuit Court of Appeals, Seventh Circuit.
January 9, 1928.

No. 3865.

1. Continuance ⬤➔46(9)—Denial of motion for continuance to produce expert witness held not abuse of discretion, where court had already indicated conclusion adverse to applicant and kind of expert proposed was not shown.

In action for damages for breach of contract to purchase pit mats, denial of continuance until following day to enable defendant to produce expert witness *held* not abuse of trial court's discretion, where he had indicated conclusion contrary to defendant's contention before motion was made, and where no showing was made as to what kind of expert proposed witness was.

2. Sales ⬤➔384(6)—Difference between contract price and cost of manufacture held proper measure of damages in action for breach of contract to purchase mats (Sales Act [St. Wis. 1925, § 121.64, par. 4]).

In action against buyer for breach of contract to purchase certain number of pit mats within period of two years, trial court did not err in holding that measure of damages was difference between contract price and cost of manufacture, under Sales Act (St. Wis. 1925, § 121.64, par. 4), where there was no market available to plaintiff in which he could, within reasonable time, have disposed of mats not taken.

3. Sales ⬤➔387—Measure of damages for breach of contract to purchase goods is for court's determination, from all facts and circumstances.

Question as to what is measure of damages for breach of contract to purchase goods is in any given case one for court to determine from all facts and circumstances.

4. Sales ⬤➔383—In action for breach of contract to purchase mats, court's conclusion that no market was available to plaintiff to dispose of mats refused held correct under evidence.

In action for breach of contract to purchase certain number of pit mats within period of two years, court's conclusion that there was no market available to plaintiff in which he could, within reasonable time and under reasonable circumstances, have disposed of mats not taken by defendant, *held* correct under evidence.

5. Sales ⬤➔384(1)—Generally seller, suing for damages for breach of contract to purchase, cannot recover "profits."

General rule is that, where seller elects to sue for damages for buyer's breach of contract to purchase, it cannot take profits; but "profits" in such rule does not refer to difference between agreed price of article and its ascertainable value or cost, but refers to something contingent on future bargains, or speculations, or states of market.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Profit.]

In Error to the District Court of the United States for the Eastern District of Wisconsin.

Action by the Wisconsin Mat Company against the Brunswick-Balke-Collender Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Howard A. Hartman, of Milwaukee, Wis., for plaintiff in error.

Francis E. McGovern, of Milwaukee, Wis., for defendant in error.

Before EVAN A. EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Defendant in error, called plaintiff, recovered a judgment against plaintiff in error, called defendant, for damages for breach of a written contract, by which defendant was, within a period of two years, to purchase not less than 15,000 nor more than 30,000 "reversible pit mats of the kind, quality, and approximate size as sample submitted, being made of India fiber rope." Delivery of more than 500 mats was not to be required the first month, nor more than 1,000 during the second month. For deliveries for any subsequent month "vendee shall serve written notice on said vendor of no less than three months in advance of said delivery, stating the quantity of mats to be delivered in any particular month." Delivery of more than 3,000 mats could not be required in any month. The contract period was from January 4, 1923, to the same date in 1925.

Prior to the expiration of the contract, defendant ordered, received and paid for 10,325 mats. After the expiration of the contract, defendant, on January 15 and March 7, 1925, ordered and received sufficient mats to make the total 11,030. On May 28, 1925, after it had been, by the terms of the contract, in default nearly five months, defendant notified plaintiff it would neither specify nor receive any more mats.

Plaintiff was the patentee and manufacturer of the mats, and defendant a very large dealer in mats. The only defense pleaded is that:

"Plaintiff from time to time shipped pit mats * * * which, because of latent defects therein not apparent to this defendant on reasonable examination of said mats, were unmerchantable, *in that said mats, after they had been from time to time sold by said defendant to its customers and trade, proved defective and worthless.*" (Italics ours.)

It was further averred that plaintiff from

time to time, when notified, promised to supply mats of better quality but did not do so; that, because of such breach, defendant refused to order further shipments. A counterclaim, based on the same allegations, was filed. There is no complaint as to the manner in which the mats were made. That the mats were of the kind and size sold is not questioned. The quality only is questioned. It is not denied that the mats were made of "India fiber," which meant, in the trade, yarn made from the husk of the cocoanut plant.

Outside of the fact that two of defendant's officers testified that one of the officers of plaintiff admitted that the mats were not up to sample, the probative force of which was very slight (see 3 Jones, Commentaries on Evidence, § 1070), there was no evidence tending to support the defense pleaded. There was no attempt to show that there were any latent defects in the mats, more than 10,000 of which had been received and paid for by defendant. All that the evidence tended to show was: (a) That some of the mats did not wear as long as it was thought they ought to wear; and (b) that some of them did not wear as long as mats purchased from plaintiff at some previous time.

What was said to be the identical sample, upon which the sale was made, was brought into court by defendant, together with a mat delivered in March, 1925. The witness said he was not capable of pointing out the difference between the various kinds of mats, but that, looking at those two side by side, there was nothing in the outward appearance to show any difference between them.

[1] At the close of the case, and after the court had indicated a conclusion contrary to defendant's contention, defendant counsel said that they had an expert witness coming from Chicago, "who will prove that the sample delivered to us, from which the mats were to be made, was entirely different and entirely superior to the mats delivered to us." What sort of an expert he was, and in what way the sample was to be shown to be superior, was not disclosed. Under the circumstances, the action of the court in denying defendant's request to continue the case until the following day, to enable it to produce the expert witness, was, we think, well within his discretionary right.

The two-year term of the contract expired January 4, 1925. The time for specifying monthly deliveries desired under the contract expired three months before that date. The fact that plaintiff did not complain of that failure, but continued, on request, in the months of January and March, 1925, to deliver mats under the contract, did not change the force of the fact that it was nearly eight months after the specifications should have been given that defendant gave notice that it would not carry out its contract.

While it appears that, from time to time, there were numerous complaints, yet, compared with the number of mats delivered, the number of complaints was small, and it also appears that plaintiff was quite ready to meet any complaint; but, so far as the record shows what the complaints were, none disclose defects which the plaintiff, under its contract, was obliged to make good. This was an installment contract. No examination of any kind was made of the 1,500 mats tendered at the time of their rejection and the repudiation of the contract. The evidence for plaintiff is that they were equal to or better than the sample.

[2] It is urged that the court applied the wrong measure of damages, and that it should have submitted the question as to whether there was or was not a market for the goods to the jury. The court held that no market value for the mats appeared, and for that and other reasons the correct measure of damages was the difference between the contract price and the cost of manufacture.

[3] The question as to what the measure of damages is in any given case is one for the court to determine from all the facts and circumstances in the case. There was no attempt to have submitted to the jury, even if there was a right to have that done, the question as to whether there was or was not a market. As to whether there was, the direct evidence shows that there was a sale, after the repudiation of the contract, of between 50 and 60 of the more than 3,000 mats. One day in September 27 were sold, in October two, and later in October 23.

Under the contract, plaintiff agreed not to make any sale of the mats to a dealer after May 1, 1923, and agreed it would not accept any more retail orders and that all such received during the life of the contract should be turned over to the vendee. That was done, and for 2½ years thereafter, until the repudiation of the contract, no market was open to plaintiff. The action of some of defendant's customers tended to give the mats a bad reputation, and, on May 25, 1925, without inquiring into the kind or quality of the mats tendered, defendant, who was then plaintiff's only market for the mats, refused to take them "except at a price," which, of course, did not mean that there was an established market.

Much has been made in argument of a statement by the senior Kottler, an officer of plaintiff. He had been testifying about the quality of mats, and that he had found

no difficulty in finding a market for them, referring to a time prior to the contract. Then he was asked, "As far as you could see, if the 1,500 mats which the Wisconsin Mat Company had were offered for sale, they ought to be salable on the market, had they not? and he answered, "Absolutely." His testimony showed that he had not been in business for more than two years prior to the time he testified and that he knew nothing about the market. It is only fair to assume that by what he said, considering the circumstances, he was merely referring to the quality of the mats.

[4] In addition to being a patented article, there had recently come into the market manila mats, which were very durable and were sold at a less price. From the whole record, we are satisfied that the conclusion of the trial court that there was no market available to plaintiff, in which he could, within any reasonable time and under any reasonable circumstances, have disposed of the more than 3,000 mats in question, was correct, and that it was therefore fair and reasonable that some other measure of damages should be applied.

[5] Defendant contends that, as plaintiff elected to sue for damages, it cannot take profits. That is true, but what is meant by profits? In Philadelphia, etc., R. Co. v. Howard, 13 How. (54 U. S.) 307, 344 (14 L. Ed. 157), the Supreme Court said:

"It is insisted that only actual damages, and not profits, were in that event to be inquired into and allowed by the jury. It (meaning under the instructions) must be admitted that actual damages were all that could lawfully be given in an action of covenant, even if the company had been guilty of fraud. But it by no means follows that profits are not to be allowed, understanding, as we must, the term 'profits' in this instruction as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract. Actual damages clearly include the direct and actual loss which the plaintiff sustains 'propter rem ipsam non habitam.' * * * Wherever profits are spoken of as not a subject of damages, it will be found that something contingent upon future bargains, or speculations, or states of the market, are referred to, and not the difference between the agreed price of something contracted for and its ascertainable value, or cost."

Defendant relies upon Kawin & Co. v. Am. Colortype Co. (C. C. A.) 243 F. 317, 323, as an authority from this court on the proposition that the rule in the state courts as to damages should prevail. This court there quoted from Fisher Co. v. Warner (C. C. A.) 233 F. 527, language which, so far as the uncertainty of the market is concerned, indicates that the circumstances there were much like those in this case. In the latter case, the court discussed the rule as to the measure of damages in various cases at considerable length, and from that case it is quite clear that the general rules are not hard and fast ones, but must and do yield to the circumstances and conditions of the particular case in question.

In 2 Williston on Sales (2d Ed.) § 583, the author says: "If there is no market value for which the goods can be sold, it is impossible to lay down a narrower principle than that sellers in such a position are 'entitled to the full amount of the damage which they have really sustained by a breach of the contract.'"

Defendant has cited Lincoln v. Alshuler Co., 142 Wis. 475, 125 N. W. 908, 28 L. R. A. (N. S.) 78. There the court said: "The measure of damages, by the ordinary rule, is the difference between the amount the appellant agreed to pay for the goods and the reasonable market value thereof. * * *" It also said: "That is subject to the exception that where there is no fair market value at the delivery point, such value may be determined at some other point. * * *"

After stating what kind of case the one before them was not, the court said: "It is a case where, so far as the record shows, while the material for the proposed sale was still the property of the executory vendors and in their hands, or the subject formed part of the general stock of manufactured goods at the factory, the vendee refused to perform. In such a case the profit on the contract is the true measure of recovery."

Paragraph 4 of section 121.64 of the Wisconsin Sales Act (Wis. Stats. 1925, p. 1221) relates to goods to be manufactured. The concluding lines of that paragraph are: "The profit the seller would have made, if the contract or the sale had been fully performed, shall be considered in estimating such damages."

We find no substantial error, and the judgment should be and it is affirmed.